UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

LIBERY MUTUAL INSURANCE COMPANY,     :

    :     Case No.:

    Plaintiff,     :

    :

    -- against --     :     **COMPLAINT**

    :

NEW YORK CITY ECONOMIC     :
DEVELOPMENT CORPORATION, URBAN     :
ENGINEERS OF NEW YORK, P.C. AND     :
MATTHEWS NIELSEN LANDSCAPE     :
ARCHITECTS, P.C.     :

    :

    Defendants.     :
-----------------------------------------------------------x

Plaintiff, Liberty Mutual Insurance Company ("Liberty Mutual"), by and through its

undersigned counsel, Chiesa Shahinian & Giantomasi PC, for its complaint in this matter alleges

as follows:

## INTRODUCTION

1.    This action for declaratory relief and breach of contract arises out of a series of

contracts relating to a construction project in New York City. Liberty Mutual, by virtue of

obligations it has under a performance bond it issued in connection with the project, is now

performing the obligations of the contractor. As such, Liberty Mutual is subrogated to all rights

of both the project owner, the New York City Economic Development Corporation

("NYCEDC") and the original contractor, Trocom Construction Corp. ("Trocom"). The claims

asserted by Liberty Mutual in this action are asserted in Liberty Mutual's capacity as subrogee of

both NYCEDC and Trocom, as well as in Liberty's own rights as completing surety.

## THE PARTIES

2.      Liberty Mutual is a corporation organized under the laws of the state of Massachusetts, with its principal place of business in Boston, Massachusetts.

3.      NYCEDC is a not-for-profit corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.

4.      Matthews Nielsen Landscape Architects, P.C. ("MNLA") is a professional services corporation organized under the laws of the State of New York with its principal place of business in New York, New York.

5.      Urban Engineers of New York, P.C. ("Urban") is a professional services corporation organized under the laws of the State of New York with its principal place of business in Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the Liberty Mutual, on the one hand, and the defendants, on the other, are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this district and all defendants are residents of state in which this district is located and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTS**

I.     **The Relevant Agreements**

A.     **The Trocom Contract and the Liberty Mutual Bonds**

8.     On or about November 6, 2012, NYCEDC and Trocom entered into Contract No. 18260004 (the "Trocom Contract") for a construction project known as West 125th Street Streetscape Improvements (the "Project").   Under the Trocom Contract, Trocom agreed to perform the work, supply the labor, and furnish the material and equipment based upon the plans and specifications in the Contract (the "Contract Work").

9.     The Contract Work included, among other things, the construction and installation of new pedestrian ramps in association with new sidewalks and curbs (the "Pedestrian Ramp Work"), which were required to comply with, among other laws, codes and regulations, the Americans with Disabilities Act (the "ADA").

10.     On or about December 2, 2013, Liberty Mutual issued Performance Bond No. 015042718 (the "Bond"), in the penal sum of $14,473,690.10, on behalf of Trocom, as principal, in favor the NYCEDC, as obligee.

11.     On or about May 7, 2015, Trocom filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.

12.     By Stipulated and Agreed Order (to which Trocom, Liberty Mutual and the NYCEDC were signatories), approved by the Bankruptcy Court on December 28, 2016 and effective as of December 9, 2016, Trocom (as Debtor) rejected, and Liberty Mutual (as completing surety), upon demand made by NYCEDC, agreed to complete, the Trocom Contract.

Liberty Mutual is now acting as the Contractor under the Trocom Contract, and, with NYCEDC's consent, is utilizing the services of Trocom to complete the Contract Work.

13.     As a completing surety, Liberty Mutual is subrogated to the rights of both Trocom (the Bond principal) and the NYCEDC (the Bond obligee).

14.     Urban is the Resident Engineer and the Corporation's Project Oversight Consultant.

15.     MNLA is the Architect/Engineer for the Project.

**B.     The Urban Contract**

16.     In connection with the Project, Urban and NYCEDC entered into a Consultant Contract for Resident Engineering Services (NYCEDC Contract No. 18260003) dated as of January 1, 2010 (the "Urban Contract").

17.     Urban was retained by the NYCEDC for the Project to perform those services described in Appendix B to the Urban Contract (the "Services"). Pursuant to Section IV.B of Appendix B to the Urban Contract, Urban agreed to perform those services necessary "to assure that the completed Work conforms in all respect to the plans, specifications, and requirements of the [Trocom] Contract as well as with good construction practices."

18.     Urban also agreed to "make commercially reasonable efforts to safeguard the City [of New York] and the NYCEDC against deficits and deficiencies in the Work, and [to] use reasonable care and reasonable powers of observation and detection in determining that the Work conforms to the [Trocom] Contract documents."

19.     Among the services Urban agreed to provide to ensure that the work performed by Trocom conformed to the Trocom Contract were:  (a) verifying that the work performed by Trocom complied with the Contract Documents; (b) performing detailed inspection work and

4

field tests of all items of work; (c) reviewing Trocom's invoices and vouchers; (d) verifying the percentage of work completed as claimed for payment; (e) recommending approval, amendment or rejection of invoices; and (f) taking all field measurements necessary for payment purposes.

20.     Section 4.2.1 of Part II of the Trocom Contract provided that: "[A]s the Contract Work progresses . . . but not more than once per month, at regular intervals as may be designated by the Corporation, the Contractor may request a Progress Payment."

21.     Pursuant to the Contract, each request for a Progress Payment had to be submitted to Urban as well as to NYCEDC.

22.     Urban was required to review the request for a Progress Payment and, if Urban was not satisfied with the accuracy or completeness of the documentation that Trocom submitted in support of its request for a Progress Payment, Urban was required to return the Progress Payment documents to Trocom with a statement listing inaccurate and incomplete items.

**C.     The MNLA Contract**

23.     In connection with the Project, MNLA and NYCEDC entered into a Consultant Contract for Planning, Design & Engineering Services (NYCEDC Contract No. 18260001) dated as of January 13, 2005 (the "MNLA Contract").

24.     MNLA was retained by NYCEDC to design the West 125th Street Streetscape Improvements, including, among other things, new pedestrian ramps in association with new sidewalks and curbs, to be constructed pursuant to the terms and specifications contained in the Contract.

25.     The MNLA Contract sets out a number of "Tasks" that comprise the Scope of Services that MNLA was required to provide to NYCEDC for the Project.

26.     Task 8 of the Scope of Services ("Design Development") required MNLA to prepare design development documents for the Project and further required that all such designs "must meet all standards of the [ADA]."

27.     Task 11 of the Scope of Services ("Check Shop Drawings and Construction Observation") required MNLA to, among other things, make periodic inspections of the Project and, where required, ascertain that the construction complied with the intended designs.

## II.     MNLA Approves Trocom's Drawings

28.     In or about March 2014, Trocom submitted drawings for steel-faced curb pedestrian ramps to Urban.

29.     On information and belief, Urban reviewed the drawings for constructability as well as compliance with the Contract Documents.

30.     Urban made no objection to the drawings, and, on information and belief, forwarded the drawings to MNLA for ultimate review and approval or rejection.

31.     In or about March 2014, MNLA approved the drawings for the steel-faced curb pedestrian ramps.

32.     In or about June 2014, Trocom submitted drawings for granite curb pedestrian ramps to Urban.

33.     On information and belief, Urban reviewed the drawings for constructability as well as compliance with the Contract Documents.

34.     Urban made no objection to the drawings and, on information and belief, forwarded the drawings to MNLA for ultimate review and approval or rejection.

35.     In or about August 2014, MNLA approved the drawings for the granite curb pedestrian ramps.

III.  **Urban Reviews and Approves Progress**
      **Payment Requisitions for the Pedestrian Ramp Work**

36.    Following MNLA's (and Urban's) approval of the drawings for the granite curb pedestrian ramps, between October 2014 and December 2015, Trocom installed 27 ramps at 18 different locations.

37.    On information and belief, the ramps at all of these locations were installed under the supervision of Urban, with periodic site visits by MNLA to monitor the compliance of the work with the approved drawings and Contract requirements.

38.    Between December 2014 and January 2016, Trocom submitted 14 requests for Progress Payments for work performed between October 14, 2014 and December 31, 2015 (the "Progress Payment Requisitions").

39.    Each Progress Payment Requisition submitted by Trocom requested payment for, among other things, Pedestrian Ramp Work that Trocom had performed during the month that was the subject of the requisition.

40.    Pursuant to Part II, Section 4.2.2 of the Trocom Contract, each Progress Payment Requisition was submitted to Urban and NYCEDC.

41.    Pursuant to Part II, Section 4.2.2.1 of the Trocom Contract, each Progress Payment Requisition included a form entitled "Contractor's Requisition for Progress Payment." The form included a paragraph which stated:

> ARCHITECT/ENGINEER'S ESTIMATE NUMBER __ OF THE VALUE OF WORK DONE AND MATERIALS AND EQUIPMENT FURNISHED UNDER THE CONTRACT WITH _____ FROM _____.

42.    MNLA was the Architect/Engineer for the Project.

43.    The bottom of the Contractor's Requisition for Progress Payment Form (below all the information concerning the payment being requested) contained the following certification:

7

I hereby certify that I have personally examined and inspected the above named work, that the amounts, quantities and extent of same are correct as herein stated and that it has been well done and in full compliance with the contract and specification therefor.

Signed: Corporation's Project Oversight Consultant: ___ Date __

44.     Urban was the Corporation's Project Oversight Consultant.

45.     On information and belief, MNLA reviewed and approved the information on each of the Progress Payment Requisitions submitted by Trocom.

46.     On information and belief, Urban reviewed, certified and approved for payment each of the Contractor's Requisition for Progress Payment Forms submitted by Trocom.

47.      On information and belief, NYCEDC, in reliance on:  (a) MNLA's and Urban's review of each of the Progress Payment Requisitions submitted by Trocom and (b) Urban's certification that the work reflected on each of the Contractor's Requisition for Progress Payment Forms had "been well done and in full compliance with the contract and specifications therefor", paid Trocom for the work reflected in the Progress Payment Requisitions.

## IV.    NYCEDC Refuses to Issue a Change Order
##         for the Pedestrian Ramp Work

48.     The Trocom Contract provides that in the event that NYCEDC requires a significant portion of the Contract Work to be changed, added or deleted, such work shall be performed pursuant to a Change Order ("Change Order Work").

49.     In or about the late fall of 2015, Urban first raised an issue with respect to whether some of the pedestrian ramps that had been installed pursuant to the MNLA-approved drawings were ADA compliant.

50.     In or about December 2015, Urban acknowledged that any work that might be required to redo non-compliant pedestrian ramps constituted Change Order Work and:  (a) on

8

information and belief, submitted to NYCEDC a Change Order request and (b) directed Trocom
to submit a proposed Change Order relating to that work.

51.     NYCEDC never approved the Change Order request submitted by Urban.

**V.     NYCEDC Directs Trocom to Redo the Pedestrian Ramp Work**

52.     On information and belief, on or about April 15, 2016, representatives of the New
York City Department of Transportation ("NYCDOT") visited the Project site and took the
position that a number of the pedestrian ramps did not comply with ADA requirements.

53.     On information and belief, on or about May 6, 2016, representatives of the
NYCDOT, along with representatives of the New York State Department of Transportation
("NYSDOT") and MNLA conducted a site visit, and NYCDOT again took the position that a
number of the pedestrian ramps did not comply with ADA requirements.

54.     On or about July 28, 2016, NYCEDC notified Trocom that it was NYCEDC's
position that 18 of the previously installed ramps were "non-compliant with the Contract
Documents" and directed Trocom to remove and reinstall those ramps at Trocom's own cost.
NYCEDC also acknowledged that a project redesign by MNLA was necessary and stated that
MNLA was "to produce design drawings for the 18 defective pedestrian ramps and the
pedestrian ramps that have yet to be installed, after which Trocom shall produce and submit to
Urban, for transmittal to MNLA, shop drawings containing sufficient detail to verify compliance
with ADA, NYSDOT and NYCDOT requirements for these curbs . . ."

55.     In or about October 2016, MNLA prepared a revised set of design drawings for
approximately 38 pedestrian ramps, including 25 ramps which had been previously installed.  A
number of the drawings contained notes indicating that the revisions were necessary because the

ramps could not have been installed in an ADA-compliant manner based on the original MNLA design drawings.

56.     On or about January 13, 2017, Urban forwarded revised pedestrian ramp designs and directed Liberty Mutual (by then the completing surety) to proceed with the submittal of drawings for the revised granite curbs.

57.     On or about February 7, 2017, Urban sent Liberty Mutual an email entitled "W125th Street: BULLETIN #15 – Redesigned Pedestrian Ramps" and attached to the email a final set of design drawings for the revised pedestrian ramps.  The drawings prepared by MNLA – at the direction of NYCEDC – would require Liberty Mutual to, among other things, remove 25 ramps that were previously installed and reinstall those ramps in accordance with the revised MNLA design drawings.

58.     While ascertainment of the full and exact amount of the costs is not feasible at this time, Liberty Mutual estimates that it will cost at least $500,000.00 to undo the completed work on the 25 completed pedestrian ramps pursuant to the revised drawings, and reinstall these ramps pursuant to a redesign by MNLA of the Pedestrian Ramp Work.

## VI.   The Notice of Claim

59.     As described above, the Trocom Contract provides that if NYCEDC requires a significant portion of the Contract Work to be changed, that work shall be performed pursuant to a Change Order ("Change Order Work").

60.     The Trocom Contract further provides for compensable extensions of time to complete Contract Work where delays have been caused by acts of the Corporation's Project Oversight Consultant (*i.e.,* Urban) or the Architect/Engineer (*i.e.,* MNLA).

61.     As set forth above, NYCEDC's direction to redo a number of the pedestrian ramps – more than one year after those ramps were originally installed – is the direct result of the actions or inactions of MNLA and/or Urban.

62.     The Trocom Contract further provides that:

> If the Contractor claims that any work . . . requested by the Corporation . . . constitutes Change Order Work for which no Change Order has been issued, the Contractor, must before commencing such Work . . . and in no event any later than within sixty (60) calendar days of the Contractor having actual or constructive knowledge of the claim or the cause thereof, submit a written Notice of Claim/Change Order Protest to the Corporation.

63.     The Trocom Contract further provides that: "Any action or proceeding by the Contractor against [NYCEDC] must be commenced within sixty (60) days after the service of the Notice of claim . . . but not before thirty (30) days after the service of the Notice of claim."

64.     As alleged above in paragraph 56, on January 13, 2017, NYCEDC directed Trocom to proceed with the work related to the new pedestrian ramps.

65.     On March 13, 2017, Liberty Mutual filed a Verified Notice of Claim with NYCEDC, the Comptroller of the City of New York (the "Comptroller") and the New York City Law Department.  In the Notice of Claim, Liberty Mutual requested, among other things: (a) the issuance of a Change Order reflecting, among other things, the agreed-upon scope of the new pedestrian ramp work, the price to be paid for the new pedestrian ramp work and the price to be paid for the removal of the previously installed ramps and (b) a compensable extension of time within which to complete the (redesigned) Pedestrian Ramp Work.

66.     By letter dated April 3, 2017, the Comptroller notified Liberty Mutual that "the City of New York has no jurisdiction over actions taken by the New York City Economic Development Corporation."

67.     NYCEDC has not responded to the Notice of Claim.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

68.     Liberty Mutual, in its capacity as subrogee of Trocom, repeats and realleges each allegation contained in paragraphs 1-67 hereof as if fully set forth herein.

69.     The Trocom Contract was and is a valid and enforceable contract.

70.     Trocom (and Liberty Mutual, as the completing surety under the Trocom Contract) have performed and are continuing to perform their obligations under the Trocom Contract, to the extent permitted by NYCEDC, Urban and MNLA.

71.     The directive to redo the Pedestrian Ramp Work constitutes Change Order Work under the Trocom Contract, for which Liberty Mutual is entitled to a Change Order and a compensable extension of time to complete the (revised) Pedestrian Ramp Work.

72.     Liberty Mutual is entitled to a declaration that:  (a) NYCEDC has materially breached the Trocom Contract by refusing to issue a Change Order in connection with its directive to Trocom to redo a portion of the Pedestrian Ramp Work and refusing to grant a compensable time extension in connection with that directive and (b) Liberty Mutual is excused from performing the revised Pedestrian Ramp Work unless and until NYCEDC issues a Change Order and grants Liberty Mutual a compensable time extension.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract against Urban)

73.     Liberty Mutual, in its capacity as subrogee of NYCEDC, repeats and realleges each allegation contained in paragraphs 1-72 hereof as if fully set forth herein.

74.     The Urban Contract was and is a valid and enforceable contract.

75.     On information and belief, NYCEDC performed all of its obligations under the Urban Contract.

76.     Urban breached the Urban Contract by, among other things:   (a) failing to properly and adequately inspect the pedestrian ramps that were installed by Trocom to determine whether they complied with the Contract Documents, including but not limited to the requirement that the ramps be ADA compliant and (b) approving the Progress Payment Requisitions that included requests for payment for the pedestrian ramps which Trocom has been instructed to remove and reinstall.

77.     Urban's multiple failures to perform its obligations under the Urban Contract constitute material breaches of the contract.

78.     But for the costs that Liberty Mutual has incurred or will incur in having to undo and redo the Pedestrian Ramp Work performed by Trocom, which work was approved by Urban and paid for by NYCEDC in reliance on Urban's certifying that such work was properly done, NYCEDC would have incurred such costs as a result of Urban's breaches of the Urban Contract, including but not limited to the costs of undoing and redoing the above-described Pedestrian Ramp Work.

79.     As subrogee of NYCEDC, Liberty Mutual is entitled to recover for the damages caused by Urban's breach of the Urban Contract.

### AS AND FOR A THIRD CLAIM FOR RELIEF
### (Breach of Contract against MNLA)

80.     Liberty Mutual, in its capacity as subrogee of NYCEDC, repeats and realleges each allegation contained in paragraphs 1-79 hereof as if fully set forth herein.

81.     The MNLA Contract was and is a valid and enforceable contract.

82.     On information and belief, NYCEDC performed all of its obligations under the MNLA Contract.

13

83.     MNLA breached the MNLA Contract by, among other things:  (a) developing design documents for the pedestrian ramps that required the installation of pedestrian ramps that were not compliant with the ADA and (b) failing to properly and adequately inspect the pedestrian ramps that were installed by Trocom to determine whether they complied with the Contract Documents, including but not limited to the requirement that the ramps be ADA compliant.

84.     MNLA's multiple failures to perform its obligations under the MNLA Contract constitute material breaches of the contract.

85.     But for the costs that Liberty Mutual has incurred or will incur in having to undo and redo the Pedestrian Ramp Work performed by Trocom, which work was prepared based on MNLA's design documents and paid for by the NYCEDC in reliance on MNLA's inspection of the pedestrian ramps for compliance with the ADA, NYCEDC would have incurred such costs as a result of MNLA's breaches of the MNLA Contract, including but not limited to the costs of undoing and redoing the above-described Pedestrian Ramp Work.

86.     As subrogee of NYCEDC, Liberty Mutual is entitled to recover for the damages caused by MNLA's breach of the MNLA Contract.

WHEREFORE, Liberty Mutual requests judgment:

(i)     On its First Claim for Relief, declaring NYCEDC in material breach of its obligations under the Trocom Contract for failure to issue a Change Order and grant Liberty Mutual a compensable extension of time to perform the Revised Pedestrian Ramp Work and excusing Liberty Mutual from performing the revised Pedestrian Ramp Work, unless and until such action is taken by NYCEDC;

(ii)     On its Second Claim for Relief, awarding Liberty Mutual damages in an amount to be determined at trial, but not less than $500,000.00, plus interest thereon;

(iii)    On its Third Claim for Relief, awarding Liberty Mutual damages in an amount to be determined at trial, but not less than $500,000.00, plus interest thereon; and

(iv)    Granting such other and further relief as this Court deems just and proper.


Dated:  New York, New York            CHIESA SHAHINIAN & GIANTOMASI PC
        May 11, 2017
                                      By:  _____
                                           JONATHAN BONDY
                                           BRIAN KANTAR
                                           STEPHEN A. WIEDER

                                      11 Times Square, 31st Floor
                                      New York, New York  10036
                                      (212) 973-0572

                                      Counsel for Plaintiff
                                      *Liberty Mutual Insurance Company*